WALTER G. FILER, Appellant, *v.* CREOLE SYNDICATE, Respondent.

First Department, November 7, 1930.

*Joseph M. Proskauer* of counsel [*Arnold L. Davis* and *Charles R. Coulter* with him on the brief; *Davis, Wagner & Heater*, attorneys], for the appellant.

*Fulton J. Redman* of counsel [*Walker & Redman*, attorneys], for the respondent.

SHERMAN, J. Defendant has judgment rendered in its favor upon trial before the court, a jury having been waived by the usual stipulation. The learned trial court treated the action as brought to recover damages for false representations claimed to have been made by McCornick, the president of defendant, and absolved defendant from liability, holding that liability, if any, was individual and not corporate. There was also ground for finding that the alleged representations which related to future conduct may not have been intentionally false when made. These considerations obscured the real nature of plaintiff's cause of action, which is in conversion.

The main facts are not in dispute. McCornick, acting in defendant's behalf as its president, procured in May, 1921, from plaintiff 25,000 shares of defendant's issued stock (being certificates held under an escrow terminating December 1, 1921). McCornick and others together with plaintiff had theretofore promoted the formation of defendant and were members of a syndicate holding a large number of shares which had been escrowed with a partnership, of which McCornick was a member. McCornick directed Cortis, the vice-president and general counsel of defendant, to obtain from plaintiff certificates for 25,000 shares, by telling plaintiff that defendant intended to sell to bankers its authorized, but unissued, stock which had a par value of five dollars and which under the laws of the State of Delaware (under which defendant was incorporated) could not be sold for less than five dollars per share, and that it was necessary for the holders of issued shares to return to defendant's treasury sufficient shares to enable defendant to give as a bonus to the purchasing bankers an equal number of shares, and thereby make it possible for defendant to sell the shares at par. Cortis informed plaintiff, who was in California, by letter and telephone conversation of this proposal and need. Plaintiff

thereupon stated to Cortis that he would contribute 25,000 shares for this purpose, provided syndicate members standing in a similar position donated a proportionate number of shares. Plaintiff carried out this understanding by sending to Cortis an assignment of 25,000 shares of the escrow stock, made out to McCornick, which assignment sets forth that it is "understood that this is my *pro rata* proportion of a contribution of two hundred and forty thousand (240,000) shares to be contributed by members of the Syndicate to the Treasurer of the company as a bonus for the sale of the treasury stock." An accompanying letter stated that plaintiff was willing to make the contribution if it was in proportion to his share and "on that basis" inclosed the assignment "for that purpose." McCornick was informed of these conditions by Cortis. The assignment was delivered to defendant's secretary who filed it with the escrow holder and subsequently defendant became possessed of the actual 25,000 shares upon the expiration in December, 1921, of the escrow arrangement.

Thereafter in January, 1923, it sold 150,000 shares to bankers at par accompanied by an equal amount of bonus stock, embracing the 25,000 shares which it had obtained from plaintiff upon the express understanding that the syndicate members were to make their proportionate contributions. McCornick and other syndicate subscribers standing in like position to plaintiff, however, contributed none of their shares; nevertheless defendant used plaintiff's shares for its own enrichment without requiring them to contribute. The new capital procured by defendant by means of this sale enabled it to acquire additional oil concessions and to derive large profits. Clearly, defendant had no right to use plaintiff's shares, without seeing to it that the agreed condition was complied with. It was chargeable with the knowledge of its executive officers and may not profit by the conversion of property, possession of which it had thus secured. It is proper to add that Cortis, who acted at McCornick's behest in obtaining possession of these shares, was not a party to their subsequent diversion. He appears to have acted throughout in good faith towards plaintiff. McCornick also falsely stated to him that the other syndicate members had contributed their proportionate share toward the bonus stock, and he believed that statement to be true.

Proof of these circumstances and of defendant's failure to return plaintiff's shares upon demand made out a cause of action in conversion and entitled plaintiff to a judgment against defendant.

Defendant's possession of plaintiff's shares was not unlawfully obtained, in the absence of a finding that McCornick directed Cortis to obtain these shares with the preconceived design of not

causing the syndicate members to contribute ratably. The evidence is consistent with a finding that not until the 150,000 shares were sold was the plan formed of using plaintiff's shares and of not causing the other syndicate members to make proportionate contribution.

Plaintiff had been absent from New York city and was not made aware of the unauthorized use of his shares until January, 1927; but the record does not set forth the precise date upon which he obtained knowledge of the conversion. He thereupon promptly made demand upon defendant for the return of his stock, so that the date of discovery and of demand virtually coincide. We are called upon to determine the rule of damages applicable and whether a new trial is necessary to ascertain the amount of plaintiff's damages.

Defendant's shares were dealt in upon the New York Curb Exchange in considerable quantities. A concededly correct summary of the price movement of the stock by which the damages must be computed is in the record.

Two theories are presented, to wit: (1) That they should be assessed at the highest price reached between January, 1923, and the date of the trial, viz., at the rate of $17.50 per share, amounting to $437,500, with interest from that time; or (2) that they be fixed at the highest price reached within a reasonable time after the discovery of the conversion and the making of the unrequited demand for their return.

The general rule is that the value of the property is to be estimated as of the time of the conversion and that, in the absence of special circumstances, such value with interest from the time of conversion constitutes the amount of the recovery. (*Mechanics & Traders' Bank* v. *Farmers & Mechanics' Nat. Bank*, 60 N. Y. 40; *Corn Exchange Bank* v. *Peabody*, 111 App. Div. 553.) That rule has been modified to meet conditions where stock speculatively held is wrongfully sold in a fluctuating market and under such circumstances a plaintiff is permitted to recover the highest price reached within a reasonable time after the conversion. (*Mayer* v. *Monzo,* 221 N. Y. 442, 446.)

During January and February, 1927, the market price fluctuated between thirteen dollars and fourteen dollars and seventy-five cents per share. The record does not show the price upon specific days, but sets forth the range of prices during that period. Realizing this condition of the proof, appellant in his brief has asked that, if this rule of damage be adopted, his recovery be fixed at the lowest price, viz., thirteen dollars per share.

The judgment appealed from should be reversed, with costs,

and judgment entered in favor of plaintiff and against defendant in the sum of $325,000, with interest thereon from February 1, 1927, with costs.

DOWLING, P. J., MERRELL, MARTIN and O'MALLEY, JJ., concur.

Judgment reversed, with costs, and judgment directed to be entered in favor of plaintiff and against defendant in the sum of $325,000, with interest thereon from February 1, 1927, with costs.