McCurn, J.
Action No. 1 is for a conversion of stock pledged with defendant bank as collateral to secure the payment of plaintiff’s promissory note. Action No. 2 is for a recovery on the promissory note. The actions were consolidated and tried before an official referee. The judgment appealed from was entered upon a decision in favor of plaintiff Jones.
During the late 1920’s plaintiff Jones was a substantial borrower at the defendant National Chautauqua County Bank of Jamestown. On November 23, 1932, he executed and delivered to the bank a new demand note for $26,815. The bank held collateral consisting of certain securities and a collateral mortgage on a two family house in the city of Jamestown. There came a time in late September, 1934, when at a meeting of the bank’s officers a decision was reached to sell some of Jones’ collateral. At that time Jones was in default in interest payments due June 19, 1934, and September 19, 1934; the taxes were in arrears on the residence property and the bank’s officers decided the loan should be reduced and some of the collateral sold. One of the officers of the bank testified that such decision was made “ for the reason that the margin of safety * * * the margin which was in the red was increasing constantly at that time. * * * The value of the collateral was shrinking *524 and it was determined at our officers’ meeting that we sell the Jamestown Metal Equipment Company [stock] because in our opinion it was selling relative [ly] at a higher value in relation to its book value than the other securities which were pledged.”
On September 21, 1934, the bank sent a notice by registered mail addressed to Jones at his law office in Jamestown that the Jamestown Equipment Company stock would be sold to the highest bidder at public sale at nine o’clock in the forenoon of October 1, 1934. Jones was in Montana at the time but the notice of sale came to the attention of his wife who immediately communicated with him. Jones in turn communicated with the bank whose officers refused to discontinue or to postpone the sale. Jones instructed his wife to. enlist the services' of Mr. Price, an attorney. Mr. Price reported by telegram to Jones that he likewise was unable to persuade the bank’s officers either to forego or to postpone the sale. Jones then wired Mr. Lawson, secretary of the Jamestown Metal Equipment Company, asking him to “ wire me collect by Western Union at once confidential information as to book value actual and market value of stock prospects and dividends of company stop Reason bank proposes to sell me ont at twenty four dollars per share stop Shall I let them do it or bid it in stop Regards ’ ’. Lawson replied: ‘ ‘ Your wire received last night. Book value of stock thirty-nine dollars some has been sold at about seventeen. Expect company will pay three percent dividend in December. Prospects fair.” Jones thereupon sent a telegram to Mr. Oscar A. Lenna, president of the Jamestown Metal Equipment Company reading as follows: “ National Chautauqua sells my stock tomorrow morning at nine o’clock catching me while out of town and over my objections as to legality stop We all know real value but they propose to sell at twenty-four and I cannot stand this sacrifice stop Will you be at sale and see that I get fair price for this stock stop Also hate to lose it for old times sake Please reply collect Regards and best wishes for your continued success ”. Lenna telegraphed in reply: ‘‘ Lawsons wire yesterday gave you details I will attend sale and see that stock is not sold for less than twenty-five dollars per share ”.
On the morning of October 1st prior to the scheduled sale Mr. Schwartz, the vice president of the bank, received a telephone call from Lenna saying that he had heard from Jones and that he had wired Jones that the stock would be protected up to $25 a share. Lenna told Schwartz that it would be inconvenient for him to attend the sale but to go ahead and sell it and the Metal Equipment Company would pick it up in a very *525 short time. Schwartz testified that a sale was held and that he reported to Mr. Lenna that the stock had been sold and that there were no other bidders. “ It had been sold for $25 a share and he was to pick the stock up very shortly and we immediately credited the proceeds of that at $25 a share on Mr. Jones’ note and advised him.” The bank sent a notice to Jones that the stock had been sold for $25 a share or a total of $6,250 which had that day been credited upon Jones’ note. It appears from the testimony that the stock remained in the possession of the bank until November 7th when the Equipment Company sent its check for $6,250 payable to the bank and picked up the stock.
In the meantime Jones returned from Montana. He went to the bank, talked with Mr. Wright, an officer at the bank, and protested that he had not had sufficient notice of the sale. He testified that he assumed that Lenna had purchased the stock but made no inquiry at the bank or from Lenna nor from anyone at the Jamestown Metal Equipment Company as to the identity of the purchaser of the stock nor as to the circumstances of the sale. He later learned that Lenna had purchased it on behalf of the Jamestown Metal Equipment Company. Jones accepted the credit of $6,250 on his indebtedness, continued to pay interest on the unpaid balance of $20,565 which he still owed. In March, 1940, he commenced this action naming the bank, the Jamestown Metal Equipment Company and its directors parties defendant. The complaint was dismissed on motion as against the Jamestown Metal Equipment Company and its directors and was thereafter amended to allege a cause of action against the bank alone. There followed a series of amended complaints until the so-called last amended complaint which was served on March 23,1945. In plaintiff’s amended complaint of August 28, 1940, he alleged that the acts of the defendant bank constituted a conversion. Such conversion as we read the complaint relates to the transactions occurring on October 1st and November 7, 1934. It will be noted that this complaint was served within six years from November 7, 1934 (former Civ. Prac. Act, § 48, subd. 3; L. 1920, eh. 925).
It was alleged in the last amended complaint and proved upon the trial that on March 4, 1941, the plaintiff Jones made a demand upon the bank for the return of all his pledged securities, including the Jamestown Metal Equipment Company stock, at the same time making a tender of full payment of his indebtedness. The bank having parted with the possession of the Jamestown Equipment Company stock on November 7, 1934, was *526 unable to comply with the demand and refused the tender. The plaintiff contended upon the trial, and the referee found, that the cause of action for conversion accrued upon the failure of the bank to comply with Jones’ tender and demand on March 4, 1941. The damage resulting from such conversion was held to be the difference between the amount credited to plaintiff upon the sale of October 1, 1934, which amount was $6,250 and the value of the stock on March 4, 1941, plus all dividends declared upon the same. Such damage, including interest to the date of the trial, was found to amount to $73,853.60. From this amount Jones’ indebtedness to the bank amounting to $20,565 was deducted and judgment, including interest and costs, granted in favor of the plaintiff Jones and against the bank in the sum of $54,904.08. Defendant bank appeals from that judgment.
The referee found that the sale of October 1, 1934, did not constitute a public sale of the collateral as provided for in the notice, but on the contrary was an attempted sale by the bank as pledgee to itself; that when the stock was delivered to the Jamestown Metal Equipment Company on November 7, 1934, upon payment of the sum of $6,250 a new sale took place from the bank to the Jamestown Metal Equipment Company and that the bank’s refusal to comply with plaintiff’s demand after tender on March 4, 1941, constituted a conversion.
We are not convinced that the facts and circumstances attending the sale of Jones’ collateral support the finding that the bank as pledgee sold to itself on October 1st and then subsequently on November 7th resold as owner to the Jamestown Metal Equipment Company. On the contrary we are inclined to the view that the Jamestown Metal Equipment Company became the purchaser upon the sale of October 1, 1934, and that the payment of the purchase price and delivery of the stock to the Jamestown Metal Equipment Company on November 7th was in consummation of that sale.
On this appeal, however, we are met with the allegation in paragraph twenty-third of the defendant bank’s answer “ That the sum of $6,250.00 paid by the Defendant for this stock and credited upon the Plaintiff’s note of November 23rd, 1932 was the fair and reasonable market value thereof * * (Italics supplied.) The plaintiff also introduced in evidence admissions contained in answers to prior complaints in this same action to the effect that the stock was sold on October 1st to the defendant bank and resold to the Jamestown Metal Equipment Company on November 7th. The bank made a like *527 admission in response to Jones’ demand before trial for admissions of facts. While such allegation in the answer and the admission appear to be inconsistent with the facts as developed upon the trial, the defendant has never attempted to amend its answer or to withdraw the admissions. The defendant bank did claim on the trial that the admission was not an “ exact statement.” The allegation in the answer, and the admission are in the nature of legal conclusions. There is authority for the proposition that a party is not bound by the admission of a legal conclusion in a pleading (see Race v. Krum, 163, App. Div. 924, affd. 222 N. Y. 410; Brewster v. Striker, 2 N. Y. 19, 40, 41; City Club v. McGeer, 198 N. Y. 160, 164-165). However, in Horan v. Hastorf (223 N. Y. 490, 494) where the defendant made an inadvertent admission in his answer it was held that his remedy was to seek relief therefrom by obtaining leave to amend his answer. Inasmuch as there must be a new trial for reasons hereinafter mentioned, it is unnecessary for the purpose of this appeal that we pass upon the effect of such admissions herein. We are leaving open for determination on the new trial whether what occurred on October 1,1934, and November 7, 1934, constituted one transaction or whether there were two separate sales, also whether a conversion resulted.
The referee has concluded that the sale of October 1, 1934, was illegal for two principal reasons: (1) that no notice of sale was published as required by section 202 of the Lien Law, and (2) that the bank as pledgee became the purchaser at the sale. The pledge contract provided for either a public or a private sale. It did not by its terms waive the requirement of the statute for publication in case of a public sale nor did it provide that the pledgee could become the purchaser at the sale.
In view of the trustee relationship resulting from the pledge, the rule against self dealing was imposed upon the pledgee so that it could not become the purchaser unless so authorized by the express terms of the contract (Colebrooke on Collateral Securities [1st ed.], § 87; Story on Bailments [9th ed.], § 319; Bryan v. Baldwin, 52 N. Y. 232). When the pledgee does become the purchaser without specific authorization under the contract, the sale will be regarded as a nullity and the pledgee will be deemed to still hold the property as a pledge, the same as before the attempted sale (Bryan v. Baldwin, 52 N. Y. 232, supra; Hopper v. Smith, 63 How. Prac. 34; Glidden v. Mechanic’s National Bank, 53 Ohio St. 588, Note, 43 L. R. A. 737).
Whatever view is taken of the circumstances attending the sale of October 1, 1934, the fact that the pledged securities *528 remained in possession of the bank until November 7, 1934, upon which date they were delivered to the Jamestown Metal Equipment Company upon receipt of its check for $6,250, is undisputed. That is the day that the bank divested itself entirely of possession and control of the pledged property. If, as claimed by plaintiff and found by the referee, the sale was illegal plaintiff’s cause of action for conversion accrued and was complete upon November 7, 1934. No demand was necessary (Pease v. Smith, 61 N. Y. 477; Ganley v. Troy City Nat. Bank, 98 N. Y. 487, 493-494; MacDonnell v. Buffalo Loan Trust & Safe Deposit Co., 193 N. Y. 92; Wood v. Fisk, 215 N. Y. 233, 239). Plaintiff could not by his tender and demand of March 4, 1941, create a new cause of action for conversion accruing upon that date. The wrong, if any, relates to the time in 1934 when defendant allegedly violated its pledge by divesting itself of the possession and control of the pledged property through an illegal sale. The tender and demand of March 4, 1941, served no useful purpose except that evidence of it might become competent as bearing upon a prior conversion (Wood v. Fisk, 215 N. Y. 233, 239, supra; 65 C. J., Trover and Conversion, § 80;. 38 Cyc p. 2032). This is a conversion action and under plaintiff’s own theory Ganley v. Troy City Nat. Bank (98 N. Y. 487, supra) has no application.
Since recovery was erroneously allowed for a conversion on March 4, 1941, obviously a new trial must be had. On such new trial' the question of whether or not there was a conversión at any other time will necessarily be in issue. The measure of damage in conversion for an illegal sale of fluctuating securities is the difference between the amount credited to the plaintiff as a result of the sale and the highest market value within a reasonable time after notice of the conversion (Baker v. Drake, 53 N. Y. 211; Wright v. Bank of Metropolis, 110 N. Y. 237; Griggs v. Day, 158 N. Y. 1; Mullen v. Quinlan & Co., 195 N. Y. 109, 115; Mayer v. Monzo, 221 N. Y. 442; 161 A. L. R. 323; 39 Harv. L. Rev. 124; Galligher v. Jones, 129 U. S. 193).
Generally the measure of damage for the conversion of a chattel is its value at the time of conversion. In the case of fluctuating securities,- however, the plaintiff is allowed the reasonable time after he knows of the conversion, in order that he .may have opportunity to replace the securities or call upon the defendant to do so, and his loss is determined by the highest value within such reasonable time.
The plaintiff must use diligence to keep down his loss. If the plaintiff within a reasonable time after knowing of the conversion could have replaced the stock for the same price or a *529 price less than that for which they were sold he would have no actionable loss (Minor v. Beveridge, 141 N. Y. 399, 403). The decisions in the cases above cited rest upon the fundamental theory that the plaintiff should be justly indemnified and where the stock has increased in value it should be “ an amount sufficient to indemnify the party injured for the loss, which is the natural, reasonable and proximate result of the wrongful act complained of, and which a proper degree of prudence on the part of the complaint would not have averted ”. (Baker v. Drake, 53 N. Y. 211, 216, supra.) The complainant must be vigilant to hold down or reduce his loss.
“ He must not by inattention, want of care or inexcusable negligence permit his damage to grow and then charge it all to the other party. The law gives him all the redress he should have by indemnifying him for the damage which he necessarily sustains. (Wright v. Bank of Metropolis, 110 N. Y. 237, 245, supra.) Plaintiff Jones testified that he did not learn of the fact that the notice of sale was not published as required by the Lien Law until he examined the files of the newspaper in March, 1940, and found no such notice. The referee made no finding as to when Jones acquired such knowledge. We note that in Jones’ telegram to Lenna he states that the bank is about to sell his collateral “ over my objection as to legality ”. We observe also that on page 19 of Jones’ first complaint dated March 23, 1940, which is in evidence he pleads ‘ ‘ that the defendant company (Jamestown Metal Equipment Company) purchased said stock with notice that plaintiff considered said sale unlawful as conducted in such manner and that plaintiff had likewise protested to said defendant bank * * As we read the complaint this allegation refers to an allegation just prior thereto containing among other things a statement to the effect that no publication of the notice of sale was had as required by the Lien Law. Jones testified that he was not aware that the bank sold to itself until he read the bank’s answer in May, 1940. Under the circumstances here the question of when Jones acquired either actual or constructive knowledge of the conversion, if there was one, is a question of fact to be determined on the new trial. Actual knowledge would have an important bearing upon the question of ratification (Manning v. Heidelbach, 153 App. Div. 790, 794). Either actual or constructive knowledge would determine the point from which the reasonable time for fixing the damages begins to run (2 Sedgwick on Damages, § 512a; Mayer v. Monso, 221 N. Y. 442, 447-448, supra). Jones knew that the sale was to take place. He was immediately notified after the sale 'that the stock had been *530 sold at $25 per share. He claimed from the beginning that the sale was illegal and the price inadequate. He made no inquiry of the bank’s officers nor of the officers of the Jamestown Metal Equipment Company nor of Lenna as to the circumstances of the sale. He was a lawyer and a business man of considerable experience and presumably knew the legal requirements for a valid sale of pledged property. There are indications in the. record that he had knowledge of facts sufficient to put him on inquiry. Yet for five years and four months, until the stock greatly increased in value, he elected to accept the benefits of the sale remaining indifferent as to the facts affecting its validity. There is no indication of concealment or lack of good faith on the part of the bank. The bank made no profit on the sale and the conversion, if there was one, was at most a technical conversion. From these and other circumstances it is for the trier of the facts to determine whether Jones had actual or constructive knowledge of a conversion and when he acquired such knowledge.
“ When a party having knowledge of such facts as would lead any honest man, using ordinary caution, to make further inquiries, does not make, but on the contrary studiously avoids making, such obvious inquiries he must be taken to have notice of those facts which, if he had used such ordinary diligence, he would readily have ascertained.” (Williamson v. Brown, 15 N. Y. 354, 360. See, also, Mayer v. Monzo, 221 N. Y. 442, 447-448, supra.)
Since the stock in question is that of a corporation closely held it should be pointed out that the value of the same should be determined after a consideration of such elements as its book value, the nature and value of the property which comprises its tangible assets, the amount and nature of the liabilities, the value of its good will including its record for earnings, its good name and reputation, the type of business it conducts, the demand for its product and business conditions generally at the time of the appraisal (Cabbie v. Cabbie, 111 App. Div. 426, 432-433; Matter of Flickinger, 176 Misc. 604). The 1941 value as determined by the referee was not in our opinion supported by a fair preponderance of competent evidence.
The judgment appealed from should be reversed and a new trial granted, with costs to the appellant to abide the event.
All concur, except Dowling, J., not voting. Present — Taylob, P. J., Dowling, Habéis, McCuen and Labkin, JJ.
Judgment reversed on the law and facts and a new trial granted, with costs to the appellant to abide the event.